508 S.E.2d 590

George PARAG, Jr. and Sandra M. Parag, Appellants,

v.

BABY BOY LOVIN, a minor, Christine Lovin, Samuel Dunlap, Jr., and John Doe, Respondents.

No. 2901.

Court of Appeals of South Carolina.

Heard Oct. 8, 1998.
Decided Nov. 16, 1998.

Jeffrey A. Keenan, of Harry Pavilack & Associates, of Myrtle Beach, for appellants.

Steven A. McKelvey, Jr. and Trefor Thomas, both of Nelson, Mullins, Riley & Scarborough, of Columbia, for respondents.

Randall K. Mullins, of Mullins Law Firm, PA, of N. Myrtle Beach, for Guardian Ad Litem.

HUFF, Judge:

George and Sandra Parag commenced this action seeking adoption of Baby Boy Lovin or, in the alternative, custody of Baby Boy Lovin. The family court determined that Samuel Dunlap, Jr., the child's natural father, possessed a right to refuse consent to the proposed adoption of the child, granted custody to the Parags, and granted Dunlap visitation rights. We reverse and remand.

## FACTUAL/PROCEDURAL BACKGROUND

In 1994, Christine Lovin and Dunlap, both teenagers, were involved in a sexual relationship. In November of 1994, Lovin informed Dunlap her menstrual cycle was late and she might be pregnant. Dunlap bought a pregnancy test for Lovin. Lovin took the pregnancy test, but "somehow messed it up." Lovin bought a second pregnancy test, but did not inform Dunlap whether the test results were positive or negative. Although the two terminated their relationship in late December, 1994 or early January, 1995, Dunlap asked Lovin on several occasions whether she had taken steps to find out whether she was pregnant. Lovin repeatedly replied that for one reason or another, she had not obtained a pregnancy test. Dunlap attempted to ascertain whether Lovin was gaining weight, but could not tell whether she was "having a round shape." On one occasion, Dunlap spoke with Lovin's sister, who informed him that "[i]f Christie doesn't hurry up and get a test or hurry up and find out if she's pregnant, I'm gonna tell Dad and I'm gonna let you know before I tell him."

Despite Dunlap's repeated inquiries, Lovin never admitted to him she was pregnant. Neither did she deny the pregnancy.

On July 8, 1995, while vacationing with her father and stepmother, Lovin gave birth to Baby Boy Lovin at Grand Strand Regional Medical Center in Myrtle Beach. On July 9, 1995, Lovin executed a consent/relinquishment for the adoption of the child. Lovin did not reveal on the consent/relinquishment that Dunlap was the child's father; rather, she indicated the father of the child was "John Doe." The child was immediately placed with the Parags.

In October 1995, Lovin informed Dunlap of the birth of the child and told him she had signed away her rights to their son. Dunlap asked Lovin where the child was and she told him he had been placed for adoption. Dunlap assumed the child was located in the county or the area where he was born. Dunlap was also aware the child was born at Grand Strand Medical Hospital in Myrtle Beach.

On July 10, 1995 the Parags initiated an action for adoption of the child. The family court held a hearing on the matter and determined an attempt should be made to locate the natural father. The Parags hired an investigator who located Dunlap as the potential father. On January 22, 1996, Ms. TeAnne Oehler, a certified adoption investigator, contacted Dunlap. Dunlap initially informed Oehler that he was planning to attend college on a football scholarship and the birth of this child interfered with his life. He stated he was not interested in having the child, but was interested in releasing the child for adoption, and asked that he be sent notice of the proceedings. On January 29, 1996, Dunlap contacted Oehler and indicated he had changed his mind about releasing the child for adoption. He stated, after talking with his grandmother and father, he thought he wanted to have the child for them to rear. At the time of trial, however, Dunlap had dropped out of college and joined the Army. Although he intended to place the child with his mother should he be given custody immediately, he stated his intent was to raise the child himself once he was given his permanent posting with the Army.

Subsequent to his phone conversations with Oehler, Dunlap was served with notice of the adoption. On March 7, 1996,

Dunlap filed a *pro se* answer asserting paternity and requesting a blood test.[1] Ultimately, the action was dismissed for failure to prosecute within the required time frame.

The Parags commenced the instant action on December 3, 1996 seeking termination of the parental rights of Dunlap and Lovin and an order granting adoption of the child. In the alternative, the Parags sought custody of the child. On December 23, Dunlap filed an answer, counterclaim and cross claim seeking, among other things, denial of the Parags' request for adoption, termination of Lovin's parental rights to the child, and custody of the child. Lovin did not answer the complaint or appear at trial.

The trial of this case was held on April 9, 1997. At trial, Dunlap testified he offered to pay for a pregnancy test, accompany Lovin to the doctor, or "pay for anything." However, because Lovin refused to tell him she was pregnant, he did not learn of the child's birth until October of 1995.

By order dated June 11, 1996, the family court denied the adoption. In so ruling, the court found Dunlap, as the child's natural father, is entitled to constitutional protection under S.C.Code Ann. § 20-7-1690 and *Abernathy v. Baby Boy*, 313 S.C. 27, 437 S.E.2d 25 (1993). The court further found Dunlap "has shown sufficient good faith efforts to assume parental responsibility" of the child such that denial of the adoption was appropriate. Pursuant to the same order, the Parags were granted continuing custody of the child.

## LAW/ANALYSIS

### A. Findings of Fact

On appeal, the Parags argue the family court erred in finding Dunlap "only had knowledge of the minor child, Baby Boy Lovin, in January of 1996 and that he shortly thereafter filed a *pro se* answer in March 1996." They assert this finding was error because the evidence shows Dunlap clearly had knowledge of the birth of the child in October 1995.

---

1. Paternity testing indicated a 99.47% probability that Dunlap is the child's father.

■ While the judge's oral ruling from the bench included this finding, his written order found only that Dunlap "became aware of the *adoption proceedings* in January 1996." (emphasis added). The written order contains no finding as to when Dunlap acquired knowledge of the birth of the child. Our reading of the record reveals the written order contains the correct factual finding as to his awareness of the adoption proceeding. Further, the record clearly reveals that Dunlap was made aware of the birth of the child in October 1995. To the extent the written order may conflict with the prior oral ruling, the written order controls. *See First Union National Bank of South Carolina v. Hitman, Inc.,* 306 S.C. 327, 411 S.E.2d 681 (Ct.App.1991), *aff'd,* 308 S.C. 421, 418 S.E.2d 545 (1992) (no order is final until it is written and entered and the trial judge retains discretion to change his mind and amend his oral ruling accordingly); *First Union National Bank of South Carolina v. Hitman, Inc.,* 308 S.C. 421, 418 S.E.2d 545 (1992) (a judge is not bound by a prior oral ruling and may issue a written order which conflicts with the prior oral ruling).

## B. Consent of Dunlap

■ The Parags also contend the family court erred in denying the adoption and in failing to terminate Dunlap's parental rights. They contend the trial judge erroneously found Dunlap's consent was required for adoption pursuant to S.C.Code Ann. § 20-7-1690 (Supp.1997) which provides, in pertinent part, as follows:

(A) Consent or relinquishment for the purpose of adoption is required of the following persons:

(5) the father of a child born when the father was not married to the child's mother, if the child was placed with the prospective adoptive parents six months or less after the child's birth, but only if:

(a) the father openly lived with the child or the child's mother for a continuous period of six months immediately preceding the placement of the child for adoption, and the father openly held himself out to be the father of the child during the six months period; or

(b) the father paid a fair and reasonable sum, based on the father's financial ability, for the support of the child or for expenses incurred in connection with the mother's pregnancy or with the birth of the child, including, but not limited to, medical, hospital, and nursing expenses.

Section 20–7–1690(A)(5)(a) has no application to this case. It is uncontested Dunlap never lived with the child or with Lovin. The family court's analysis was based on § 20–7–1690(A)(5)(b), which provides for obtaining an unwed father's consent where the father has provided financial support for the child, or has paid expenses incurred in connection with the pregnancy.

The Parags assert, because Dunlap has not provided financial support to either Lovin or the child, Dunlap does not fall into the category of persons whose consent or relinquishment is required for adoption pursuant to § 20–7–1690(A)(5)(b). The inquiry, however, does not end with Dunlap's failure to comply with the literal requirements of § 20–7–1690(A)(5)(b).

In *Abernathy v. Baby Boy*, 313 S.C. 27, 437 S.E.2d 25 (1993), our Supreme Court held an unwed father's consent to adoption is required even where he does not meet the literal requirement of § 20–7–1690(A)(5)(b), mandating that a father provide for the support of his child before the state is compelled to seek consent to the adoption of the child, where his attempts to comply with the statute are thwarted by the child's mother. The court held "an unwed father is entitled to constitutional protection not only when he meets the literal requirements of § 20–7–1690(A)(5)(b), but also when he undertakes sufficient prompt and good faith efforts to assume parental responsibility and to comply with the statute."

It is incumbent, however, upon the unwed father to demonstrate a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of the child before he may acquire substantial constitutional protection, and the mere existence of a biological link does not merit equivalent constitutional protection. While the unwed father possesses an opportunity to develop a relationship with his offspring, this opportunity is of limited duration as a constitutionally significant interest because of the child's need for early permanence and stability in parental relationships. As

stated by the court in *Abernathy*, "Time and circumstances may limit the protectibility of an unwed father's interest in his child. The values that underlie protection require that the father take advantage of his opportunity to develop a relationship with his child *early and completely.*" 313 S.C. at 33, 437 S.E.2d at 29 (emphasis added). Thus, the unwed father must timely "demonstrate his commitment to the child, and his desire to grasp the opportunity." 313 S.C. at 32, 437 S.E.2d at 29.

Turning to the facts at hand, we find Dunlap has failed to demonstrate sufficient prompt and good faith efforts to assume parental responsibility and comply with the statute. Dunlap was aware that Lovin might be pregnant in November of 1994. While Dunlap claims he was thwarted in his efforts to assist Lovin with the pregnancy by her avoidance of him, the record clearly shows that in October 1995, Lovin informed Dunlap of the pregnancy and the birth of his child. He was further aware at that time that the child was placed for adoption and he correctly assumed the child was in the area where Lovin had given birth. From October of 1995, Dunlap had information with which he could have sought the exact location of his child and made efforts to cultivate a relationship with the child and assume parental responsibility. However, he failed to take any action until he was contacted by the adoption investigator, three months later. Even then, the record evinces the extent of his efforts to be only submission to paternity testing and participation in the adoption action. There is absolutely no evidence that Dunlap was thwarted in any way from demonstrating his commitment to the child once he learned of the child's birth. It is uncontested Dunlap never offered any financial support or assistance to Lovin in connection with the expenses of the pregnancy and birth after learning of the child's birth. Further, the record shows Dunlap never offered any financial support for the child after learning of the child's birth. *See Ex parte Black*, 330 S.C. 431, 499 S.E.2d 229 (Ct.App.1998) (assuming unwed father took prompt measures to determine paternity and assert parental rights after biological mother informed father of child's existence, where father failed to offer to support child or assist in medical expenses, his consent to adoption was not required under § 20–7–1690(A)(5)(b)). We therefore conclude Dunlap has failed to timely demonstrate his commitment to the child

and has failed to show sufficient efforts to assume parental responsibility and comply with the statute as required under *Abernathy*. Accordingly, Dunlap's consent was not required under § 20–7–1690(A)(5)(b), and the order below denying the adoption on this basis is reversed.[2]

### C. Termination of Lovin's Rights

■ The Parags also argue the family court erred in failing to rule on the termination of the mother's parental rights. We agree.

The record shows Lovin executed a consent/relinquishment for adoption which specifically waived her rights to notice of adoption of the child and any proceedings regarding the termination of her parental rights. However, Lovin was made a party to the action and served with the pleadings anyway. Lovin failed to answer the pleadings or appear at trial. Although both the Parags and Dunlap requested termination of Lovin's parental rights, the trial judge simply declined to rule on the request. We find this was error. Accordingly, we also remand this issue for a ruling by the trial judge.

**REVERSED AND REMANDED.**

GOOLSBY and HOWARD, JJ., concur.

■

---

2. The Parags also assert the family court erred in failing to terminate Dunlap's parental rights due to his failure to visit or support the minor child pursuant to S.C.Code Ann. § 20–7–1572 (Supp.1997). In light of our reversal of the denial of the adoption based on § 20–7–1690, we find it unnecessary to reach this issue.